**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| GRANITE TELECOMMUNICATIONS, LLC, <br> 234 Copeland Street <br> Quincy, Massachusetts 02169, <br><br> Plaintiffs, <br><br> v. <br><br> AT&T CORP., <br> 1 AT&T Way <br> Bedminster, New Jersey 07921, <br><br> AT&T COMMUNICATIONS, INC., <br> 1 AT&T Way <br> Bedminster, New Jersey 07921, and <br><br> DOES 1-20, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | CASE NO. 1:05cv01416 <br><br> Judge Ellen Segal Huvelle <br><br> JURY TRIAL REQUESTED |

## ANSWER AND COUNTERCLAIMS

Defendants AT&T Corp and AT&T Communications, Inc. (collectively "AT&T"), by and through their attorneys, herein respond to the Complaint filed by Plaintiff Granite Telecommunications, LLC ("Granite").

As a preliminary matter, AT&T notes that Granite grounds its claims in this action in part upon the determinations made by the Federal Communications Commission ("FCC") and set forth in an Order released on February 23, 2005 in WC Docket No. 03-133 ("Prepaid Calling Card Order"). The FCC issued the Prepaid Calling Card Order in response to a petition AT&T filed seeking a declaratory ruling regarding regulation of its enhanced pre-paid calling card service ("enhanced pre-paid service"). AT&T has appealed the FCC's determinations in the

Prepaid Calling Card Order to the United States Court of Appeals for the District of Columbia

Circuit.  AT&T maintains that, even if the Prepaid Calling Card Order is upheld on appeal,

AT&T has no liability to Granite under any of the claims asserted in the Complaint.  However, a

ruling from the appeals court in AT&T's favor could foreclose the basis for, and thus warrant the

dismissal of, Granite's claims to the extent they are based on the Prepaid Calling Card Order.

Accordingly, AT&T asserts a global denial of the findings in the FCC's Prepaid Calling Card

Order.

Any allegation not expressly admitted is denied.  AT&T states as follows:

## NATURE OF THE ACTION

1.     This case involves AT&T's failure to pay legally required charges for its use of Granite's local network facilities to receive and complete long-distance calls.  Whenever one of AT&T's long-distance customers makes a long-distance call to one of Granite's local telephone customers, AT&T uses Granite's local facilities to complete, or "terminate," the AT&T long-distance call.  Similarly, whenever one of AT&T's long-distance customers uses a local telephone line provided by Granite to place a long-distance call, AT&T uses Granite's local facilities to "originate" the long-distance call.  Pursuant to contracts and Granite's federal and state tariffs on file with the Federal Communications Commission ("FCC") and state regulatory authorities, AT&T is required to pay Granite for this "originating" and "terminating" "access" to Granite's local exchange facilities.

**ANSWER NO. 1:**     AT&T admits that Granite seeks in this case to recover charges

from AT&T, but AT&T denies the remaining allegations in the first sentence of paragraph 1.

AT&T admits that, for many long distance calls, AT&T uses local facilities of local exchange

carriers, like Granite, to terminate and/or originate such calls, but AT&T denies the remaining

allegations in the second and third sentences of paragraph 2.  AT&T admits that tariffs filed with

the FCC and state regulatory commissions typically state the terms and conditions on which local

exchange companies like Granite offer services, but AT&T denies the remaining allegations in

the last sentence of paragraph 1.

2.      Beginning in or around 2000 and continuing through the present, AT&T orchestrated and implemented at least two fraudulent schemes in an attempt to avoid Granite's "access charges" (along with access charges of numerous other carriers), as described herein.

**ANSWER NO. 2:**     Denied.

3.      The FCC has twice rejected AT&T's supposed bases for failing to pay access charges to local carriers such as Granite, in orders released in April 2004 and February 2005. Rather than award damages, however, the FCC instructed carriers damaged by AT&T's violation of access charge requirements to seek recovery in court.

**ANSWER NO. 3:**     AT&T admits that the FCC released two orders in April 2004 and February 2005 that relate to AT&T's phone-to-phone Internet Protocol ("IP") telephone service and to AT&T's enhanced prepaid calling card services, but avers that the FCC's orders speak for themselves.  AT&T denies the remaining allegations in paragraph 3.

4.      Particularly in light of these FCC decisions, AT&T has no excuse for its failure to pay lawfully tariffed access charges.  Accordingly, Granite seeks to recover the access charges that AT&T has unlawfully failed to pay and to enjoin AT&T from continuing its unlawful conduct.

**ANSWER NO. 4:**     AT&T admits that Granite alleges in this suit that it has suffered damages related to nonpayment of access charges.  AT&T denies the remaining allegations in paragraph 4.

## JURISDICTION AND VENUE

5.      This is, in significant part, a collection action for payments arising under section 203 of the Communications Act of 1934, 47 U.S.C. § 203, and Granite's interstate access tariffs filed thereunder.  This Court accordingly has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 and 47 U.S.C. § 207.  In addition, since AT&T is a common carrier, Granite's claims also arise under section 206 of the Communications Act of 1934, 47 U.S.C. § 206.  This court has jurisdiction over Granite's state-law claims pursuant to 28 U.S.C. § 1367.

**ANSWER NO. 5:**     AT&T admits that this Court has jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1337 and 1367.  AT&T denies the remaining allegations in paragraph 5.

6.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b), as AT&T has agents and transacts business in this district.

**ANSWER NO. 6:**    Denied.

## ALLEGATIONS COMMON TO ALL COUNTS PARTIES

7.     Granite is a limited liability company organized under the laws of the state of Delaware, with its principal place of business at 234 Copeland Street, Quincy, Massachusetts 02169. Granite currently provides local exchange telephone service in 49 states and the District of Columbia (every state except Alaska).

**ANSWER NO. 7:**    AT&T is without knowledge of the truth or falsity of the

allegations in paragraph 7, and they are therefore denied.

8.     AT&T Corp. is a New York corporation with its principal place of business at 1 AT&T Way, Bedminster, New Jersey 07921. AT&T Corp. provides, among other things, telecommunications services throughout the United States, including in the District of Columbia. AT&T Corp. can be served with process by serving its registered agent for service of process: CT Corporation System, 1015 15th Street, N.W., Suite 1000, Washington, D.C. 20005.

**ANSWER NO. 8:**    Admitted.

9.     AT&T Communications, Inc. is a wholly owned subsidiary of AT&T Corp. AT&T Communications, Inc., with its principal place of business at 1 AT&T Way, Bedminster, New Jersey 07921, and can be served with process by serving its registered agent for service of process: CT Corporation System, 1015 15th Street, N.W., Suite 1000, Washington, D.C. 20005.

**ANSWER NO. 9:**    Admitted.

10.     The true names and roles of defendants DOES 1-20, inclusive, are unknown to Granite, which accordingly sues those defendants by fictitious names. Granite believes and alleges that each of the DOE defendants is legally responsible in some manner for the events alleged in this Complaint and the resulting injury and damages caused to Granite. Granite will amend the Complaint to reflect the true names and roles of the DOE defendants when Granite obtains that information.

**ANSWER NO. 10:**    Denied.

11.     AT&T Corp. and its affiliates listed above, which are collectively referred to as "AT&T" throughout this complaint, effectively operate as a single enterprise. AT&T has complete control and influence over these subsidiaries. This control and influence includes, among other things, all decisions regarding the services AT&T's subsidiaries provide, the facilities they use, the traffic sent over those facilities, the agreements into which they enter, and the way they market and sell their service. AT&T coordinates and controls one overarching position concerning all of these issues from its corporate headquarters. AT&T and all of its

subsidiaries also operate as a single integrated operation, under a nationwide brand. AT&T has used each of these subsidiaries, individually and collectively, as a subterfuge to assist AT&T in conducting and perpetuating fraud. In particular, AT&T has used these subsidiaries to conceal, AT&T's interexchange traffic so that AT&T could avoid paying Granite's lawfully tariffed access charges. AT&T routed interexchange traffic over facilities that these subsidiaries had previously obtained for the express purpose of terminating primarily local traffic with Granite and other LECs. This enabled AT&T to disguise its interexchange traffic from Granite and other LECs, and, consequently, to avoid being billed access charges for this traffic. For the foregoing reasons, the subsidiaries listed above constitute alter egos of AT&T Corp.

**ANSWER NO. 11:**   Denied.


## BACKGROUND

### The Access Charge Regime

12.    This action centers on AT&T's non-payment for switched access charges owed to Granite in accordance with Granite's lawful tariffs and a contract between the parties. Access charges are the fees that long-distance carriers such as AT&T must pay local exchange carriers such as Granite to defray the costs associated with the use of local exchange facilities for originating and terminating long-distance calls. These switched access charges are established and mandated by federal and state regulations and tariffs, which are described in detail below.

**ANSWER NO. 12:**   AT&T admits that this suit concerns allegations of non-payment of access charges, but denies that it has any liability for such access charges. AT&T further admits that the rates at which local exchange carriers offer access services are generally found in tariffs and, in some cases, are contained in agreed-upon contracts. AT&T denies the remaining allegations in paragraph 12.

13.    Since the breakup of the Bell System in 1984, local exchange carriers ("LECs"), such as Granite, and long-distance carriers, such as AT&T, have played largely distinct roles in the telecommunications industry. LECs have primarily carried local calls – i.e., calls between end users located within local calling areas or exchanges. Long-distance carriers have traditionally carried calls between exchanges, on both an intrastate and interstate basis. This long-distance service is known as "interexchange" service.

**ANSWER NO. 13:**   AT&T admits that the Bell System was the subject of a consent decree that became effective on or about January 1, 1984, and that, in many cases up until 1996, local exchange carriers primarily carried local calls within an exchange and long distance

carriers primarily carried long distance calls that traveled between exchanges. AT&T further admits that long-distance service is sometimes referred to as "interexchange" service. AT&T denies the remaining allegations of paragraph 13.

14.    In order to provide interexchange service, long-distance carriers such as AT&T typically establish one or more points of presence (POPs) within a given area. POPs are facilities that provide a point of interconnection between local exchange networks and interexchange networks. When a customer makes an interexchange call, that customers local exchange carrier transports the call over the local exchange carrier's network to the POP of the long-distance carrier that the customer has selected (say, AT&T). The long-distance carrier then transports the call from the POP in the area where the calling party is located (i.e., where the call originates) to the POP in the area where the called party is located (i.e., where the call terminates). The called party's local exchange carrier then receives the call from the long-distance carrier, either directly or through an intermediary, and delivers it to the called party.

**ANSWER NO. 14:**    AT&T admits that the allegations of paragraph 14 are accurate, in a general sense, with respect to ordinary long-distance calls. AT&T denies that the allegations of paragraph 14 apply in every local exchange. AT&T denies, for example, that it has a point of presence in each local exchange.

15.    The transmission of an interexchange call from the calling party to a long-distance carrier's POP is known as "originating access." The transmission of an interexchange call from a long-distance carrier's POP to the called party is known as "terminating access."

**ANSWER NO. 15:**    AT&T admits that the allegations of paragraph 15 are accurate, in a general sense, with respect to ordinary long-distance calls.

16.    Federal and state tariffs (or, in the absence of a tariff, contracts between the carriers) dictate the appropriate originating and terminating access charges that apply to a given interexchange call, depending on whether the call is interstate or intrastate. If the call originates in one state and terminates in another, the access charges that apply are set forth in interstate tariffs filed with the FCC. If the call originates and terminates within the same state, the access charges that apply are set forth in intrastate tariffs filed with individual state regulatory commissions.

**ANSWER NO. 16:**    AT&T admits that the rates and other terms at which local exchange carriers offer access services are generally found in tariffs and, in some cases, are contained in agreed-upon contracts. AT&T admits that intrastate calls, as a general matter, are

subject to tariffs that are typically filed with state public utility commissions and that interstate calls are generally subject to tariffs typically filed with the FCC. AT&T denies the remaining allegations in paragraph 16.

17.    For historical and regulatory reasons beyond the scope of this Complaint, most LECs' intrastate access charges are often higher (in many cases, considerably so) than interstate access charges.

**ANSWER NO. 17:**    AT&T admits that the rates for intrastate access services offered by most local exchange carriers are often higher than the rates for interstate access services. AT&T denies the remaining allegations in paragraph 17.

18.    Local calls are subject to a different regulatory regime, called "reciprocal compensation." Under reciprocal compensation, the parties exchanging local traffic either agree on rate at which the carriers bill each other for termination of each other's local traffic (typically much lower than access charges) or the parties assume a relative balance of traffic and agree to an arrangement termed "bill and keep" in which no payments are exchanged between the carriers; rather carriers recover the costs of terminating traffic from their own customers.

**ANSWER NO. 18:**    AT&T admits that local calls typically do not incur access charges. AT&T admits that compensation for the exchange of local calls between carriers can be subject to a variety of types of "reciprocal compensation" arrangements. AT&T denies the remaining allegations in paragraph 18.

19.    Granite provides service over the majority of its local telephone lines using switching capability leased from an incumbent local exchange carrier (ILEC). The rates Granite pay to lease switching capacity from the ILECs are premised in part upon the design that Granite, rather than the ILEC, will bill and collect access charges from long-distance carriers such as AT&T.

**ANSWER NO. 19:**    AT&T admits that, to the extent competitive local exchange carriers lease switching capacity from incumbent local exchange carriers, the rates for such capacity are governed by the Telecommunications Act of 1996 and FCC regulations, which provide, among other things, that in such circumstances CLECs will bill any applicable access

charges.  AT&T is without knowledge of the truth or falsity of the remaining allegations in

paragraph 19, and they are therefore denied.

20.    Long-distance traffic destined for Granite's customers is delivered by the long-distance carrier, or another carrier acting on its behalf, to the ILEC's network, which routes the calls to Granite's customers.  The ILEC then provides Granite with records of each long-distance call as reported by the long-distance carrier that, if such records are accurate, enables Granite to assess and bill the appropriate interstate and intrastate terminating access charges to the long-distance carrier.

**ANSWER NO. 20:**    AT&T admits that some local exchange carriers are not directly

connected to interexchange carriers, and instead connect indirectly to interexchange carriers

through the networks of incumbent local exchange carriers.  AT&T is without knowledge of the

truth or falsity of the remaining allegations in paragraph 20, and they are therefore denied.

<u>AT&T's Obligations to Pay Access Charges to Granite</u>

21.    During the entire relevant period, Granite has offered switched access charges pursuant to tariffs filed with the FCC (for interstate access services) and the respective state public utilities commissions in states where Granite operates as a local exchange carrier (for switched intrastate access services).  The provisions of these tariffs are binding on AT&T and govern the rates, terms and conditions that Granite may offer switched access services.

**ANSWER NO. 21:**    AT&T admits that Granite has offered switched access services in

tariffs filed with the FCC and with some state public utility commissions.  AT&T denies the

remaining allegations in paragraph 21.

22.    In June 2003, AT&T and Granite executed a settlement to resolve a dispute arising from AT&T's refusal to pay Granite for certain invoiced access charges.  The settlement included execution of a contract ("Contract") that obligated AT&T to pay Granite's access charges on a going forward basis.  Pursuant to the Contract, AT&T agreed to settle the dispute over invoiced access charges billed by Granite through March 31, 2003.  AT&T has paid that amount, and there is no dispute between AT&T and Granite for switched access services rendered prior to March 31, 2003 that Granite invoiced to AT&T, except, to the extent that, as explained below, AT&T defrauded Granite.

**ANSWER NO. 22:**    AT&T admits that Granite and AT&T had a dispute regarding

Granite's switched access rates and that the dispute was settled in 2003.  AT&T further admits

that there is an agreement between AT&T and Granite regarding Granite's switched access

services.  AT&T also admits that there is no dispute between AT&T and Granite for switched access services rendered prior to and including March 31, 2003.  AT&T denies the remaining allegations in paragraph 22.

<u>AT&T's Evasion of Interstate and Intrastate Access Charges</u>

23.    Beginning in or around 2000, AT&T began disguising long-distance interexchange calls it delivered to Granite and other LECs, thereby preventing Granite from detecting the interexchange nature of the calls and enabling AT&T to avoid being billed for the lawfully tariffed access charges that apply to such calls.  For example, AT&T repeatedly disguised interstate and intrastate long-distance calls as local calls, and in other cases disguised intrastate long-distance calls as interstate.  AT&T disguised calls by concealing, changing, causing to be concealed or changed, or otherwise misrepresenting the originating telephone number transmitted with the call, and by materially misrepresenting other information provided to Granite.  The information AT&T concealed, changed and/or misrepresented is information that is essential to Granite's ability to identify whether calls are interexchange in nature and, if so, whether they are local, interstate long-distance or intrastate long-distance calls.

**ANSWER NO. 23:**   Denied.

24.    By design, AT&T's improper call-termination scheme prevented Granite from distinguishing between local traffic and interexchange traffic.  Granite was thus unable to bill for (or even to detect or measure) a great deal of interexchange voice traffic that AT&T delivered to Granite for termination.  Therefore, Granite could not reasonably have been expected to determine AT&T's actual use of its access services and bill AT&T the appropriate charge.

**ANSWER NO. 24:**   Denied.

25.    AT&T disguised, as described in paragraph 23 above, a substantial portion of its long-distance calls, apparently based upon the incorrect premise that the calls were not subject to access charges because they used Internet Protocol ("IP") for an intermediate portion of its transmission between AT&T POPs.

**ANSWER NO. 25:**   Denied.

26.    IP is a technology that was originally developed for use in connection with the public Internet.  Because IP is so efficient at carrying traffic, however, many carriers, including AT&T, have been implementing it on their private networks as well.  And, although IP was originally developed to carry data traffic generated by computers, technological advances over the past several years have made it possible to use IP to transmit ordinary voice traffic as well.

**ANSWER NO. 26:**    AT&T admits that it has used Internet Protocol on its network. AT&T further admits that IP can be used to transmit both data and voice traffic.  AT&T denies the remaining allegations in paragraph 26.

27.    In this respect, IP technology is simply the latest in an array of transmission technologies used to transmit ordinary telephone calls from one point to another.  Some carriers use microwave transmission, others use fiber-optic cables, others use satellites, and still others continue to use the copper wires that have been in use for decades.  As the FCC has recognized, the mere choice of transmission technology makes no difference to the regulatory classification of a telephone call or the applicability of access charges.  Instead, under the Communications Act of 1934, 47 U.S.C. § 151 et seq. "telecommunications" is defined as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received."  47 U.S.C. § 153(43).  Thus, under the Act and the FCC's long-standing rules, provided that the call begins and ends as an ordinary, circuit-switched telephone call, the technology a carrier elects to use to facilitate its transmission is irrelevant for purposes of access charges.

**ANSWER NO. 27:**    AT&T avers that the orders of the FCC and the text of the Communications Act of 1934 speak for themselves, and no response is required.  Further, AT&T avers that the last sentence of paragraph 27 states a legal conclusion, which is for the Court, and to which no response is required.  AT&T denies the remaining allegations in paragraph 27.

28.    In order for a long-distance carrier to use an Internet backbone in the transmission of ordinary long-distance voice traffic, it must perform what is known as a "protocol conversion" on both ends of the call.  For example, in the case of an AT&T long-distance subscriber in New York making a call to Washington, DC, the call (1) originates on the network of a local exchange carrier in New York as an ordinary telephone call, (2) is handed to AT&T in that format, (3) is converted by AT&T into the IP format, (4) is transmitted by AT&T in the IP format on its Internet backbone for some distance between New York and Washington (although not necessarily the entire distance), (5) is converted back into an ordinary telephone call by AT&T or a party acting on its behalf, (6) is handed to the local exchange carrier in Washington in that format, and (7) is delivered to the called party in Washington by the local carrier.

**ANSWER NO. 28:**    Denied.

29.    In this scenario, neither the calling party in New York nor the called party in Washington has any idea that their call has been converted to the IP format in the middle.  The transmission of the call, between or among points specified by the user, is dialed and received in the same manner as any other long-distance call, and AT&T's service offers nothing more than the transmission of information of the user's choosing, without a net change in the form or content of the information assent and received.  In fact, although AT&T has been performing these protocol conversions and using IP to transmit an increasing portion of its customers' long-

distance telephone calls, it has continued to bill its customers for these calls as ordinary long-distance calls, it has not informed them that these protocol conversions were taking place, and it has nor stopped paying LECs the originating access charges that apply to these calls. By paying LECs the originating access charges on these calls, AT&T acknowledged that they were switched access calls.

**ANSWER NO. 29:**    Denied.

30.    AT&T did, however, avoid paying terminating access charges for calls that it transmits using IP, by disguising those calls as local calls on the terminating end. As noted above, a long-distance call that AT&T transmits using IP is no different than a long-distance call using any of the other transmission technologies noted above, and the terminating LEC performs the same functions over the same facilities to deliver that call to the called party. In fact, the terminating LEC ordinarily would not even be aware of whether an interexchange call it receives from AT&T is transmitted using IP within AT&T's network, provided it is converted back into an ordinary telephone call before it is delivered to the terminating LEC.

**ANSWER NO. 30:**    Denied.

31.    In addition to its misclassification of calls using IP, AT&T, as described in paragraph 23 above, disguised certain intrastate (in-state) prepaid calling card long-distance calls as interstate calls (which are in most cases subject to lower access charges), when in fact the calling and called parties were located in the same state, purportedly based on the incorrect premise that the calls were not subject to intrastate access charges because AT&T routed the call through its 8YY (i.e., 800-number) platform in another state. In other cases, AT&T disguised interstate and intrastate prepaid calling card calls so at to avoid being billed for access charges altogether.

**ANSWER NO. 31:**    Denied.

32.    AT&T later attempted to justify this ruse by claiming that when a customer using such a card places a call to someone in the same state, the call would be considered interstate because it consists of two calls, one between the caller and the AT&T platform delivering the recorded advertisement and one between that platform and the called party, and that at least one of those "calls" is interstate.

**ANSWER NO. 32:**    With respect to AT&T's enhanced prepaid calling card service, AT&T admits that its service permitted cardholders to use AT&T's telecommunications network to make long distance calls and that, before placing a long distance call, cardholders must first access AT&T's prepaid calling card platform through a toll-free number. AT&T further avers that the prepaid calling card platform provides non-call information to the card holder and

performs other functions besides routing the call. AT&T denies the remaining allegations in

paragraph 32.

33.    AT&T pursued both the IP and calling card access-avoidance schemes surreptitiously for several years. Then, in the wake of several criminal prosecutions of companies that had unlawfully evaded lawfully tariffed access charges, AT&T sought to cloak its behavior with the imprimatur of the FCC. Specifically, in October 2002, AT&T filed a petition with the FCC requesting that the FCC declare that a telephone call converted to IP, carried on an Internet backbone, and then converted back to an ordinary telephone call for termination was exempt from access charges. Then, in May 2003, AT&T filed another petition with the FCC requesting that the FCC declare that AT&T's prepaid calling card services as described above be deemed jurisdictionally interstate and therefore exempt from intrastate access charges.

**ANSWER NO. 33:**    AT&T admits that it filed a petition with the FCC in October,

2002, regarding AT&T's IP services. AT&T also admits that it filed a petition with the FCC in

May, 2003, regarding AT&T's enhanced pre-paid calling card services. AT&T otherwise denies

the allegations in paragraph 33.

34.    AT&T did not, however, wait for the FCC to rule on its petitions. Instead, even while its petitions were pending and unbeknownst to Granite, AT&T continued its practice of improperly terminating long-distance calls to Granite and other LECs in a manner designed to evade Granite's and other LECs' detection of the interexchange, and interstate and intrastate, nature of the calls and to avoid access charges on massive amounts of traffic.

**ANSWER NO. 34:**    Denied.

35.    Ultimately, the FCC unanimously rejected both of AT&T's petitions. First, on April 21, 2004, the FCC declared that, under its longstanding existing rules, the conversion of ordinary telephone traffic to IP and back again has no effect on the regulatory classification of the telephone call. The FCC further held that AT&T is required to pay access charges for all interexchange voice traffic that originates and terminates over circuit-switched local exchange networks, including traffic that is converted to IP and transmitted over AT&T's Internet backbone at some point in the middle before being reconverted to be delivered to a local carrier. The FCC, accordingly authorized local telephone companies to pursue collection actions such as this one against AT&T for access charges that AT&T had failed to pay based on its unlawful scheme.

**ANSWER NO. 35:**    AT&T admits that the FCC issued two orders relating to AT&T's

IP telephony service and AT&T's prepaid calling card services, but avers that the orders speak

for themselves. AT&T denies the remaining allegations in paragraph 35.

36. Then, on February 23, 2005, the FCC held that AT&T's prepaid calling card calls between callers located in the same state are intrastate telecommunications services subject to intrastate access charges, under the same "end to end" analysis that the Commission had applied to other calling card and other telecommunications services for many years. As in its April 21, 2004 order, the FCC again instructed local exchange carriers that claims for unpaid access charges be filed with an appropriate court or state commission rather than brought to the FCC.

**ANSWER NO. 36:**   AT&T admits that the FCC issued an order on February 23, 2005,

relating to AT&T's prepaid calling card services, but avers that the order speaks for itself.

AT&T denies the remaining allegations in paragraph 36.

37. Until it filed the petitions with the FCC described in paragraph 33 above, AT&T fraudulently concealed its schemes to avoid access charges. Even when it filed these petitions, AT&T fraudulently misrepresented the extent to which it was engaging in such schemes.

**ANSWER NO. 37:**   Denied.

38. Even after these FCC decisions, AT&T has continued to engage in practices to prevent Granite's detection of the interexchange, and interstate and intrastate, nature of calls and thereby attempt to avoid access charges, but apparently on a lesser scale.

**ANSWER NO. 38:**   Denied.

39. Particularly in light of these FCC's decisions, AT&T has no excuse for continuing its scheme and its failure to pay Granite access charges for long-distance calls in accordance with Granite's state and federal tariffs, and the Contract.

**ANSWER NO. 39:**   Denied.


## COUNT I
### (BREACH OF FEDERAL TARIFF)

40. Granite incorporates by reference as though fully set forth herein the allegations of preceding paragraphs of this Complaint.

**ANSWER NO. 40:**   AT&T hereby incorporates by reference, as though fully set forth

herein, the previous responses to the allegations in the preceding paragraphs of this Complaint.

41. For the reasons set forth above and in the FCC Access Charge Order and FCC AT&T Calling Card Access Charges Order, pursuant to Granite's lawful Federal Tariffs, AT&T is liable to Granite for its failure to pay interstate access charges on interstate interexchange traffic that AT&T delivered to Granite for termination.

**ANSWER NO. 41:**   Denied.

42.    Granite's interstate access charges are set forth in its F.C.C. Tariff No. 1.

**ANSWER NO. 42:**    AT&T admits that tariffs contain the rates and other terms on which Granite offers certain of its access services. AT&T denies the remaining allegations in paragraph 42.

43.    Granite's Federal tariff provides, among other things, that AT&T must pay Granite tariffed access charges for both originating access and terminating access.

**ANSWER NO. 43:**    AT&T avers that paragraph 43 states a legal conclusion, and that conclusions of law are for the Court. Further, the tariffs speak for themselves and no response is required. Any remaining allegations in paragraph 43 are denied.

44.    Granite fully performed its obligations under its federal tariff, except for those it was prevented from performing, those that it was excused from performing, or those that were waived by AT&T s misconduct as alleged herein.

**ANSWER NO. 44:**    Denied.

45.    AT&T failed to pay Granite for interstate switched access services in accordance with its federal tariff.

**ANSWER NO. 45:**    Denied.

46.    AT&T materially violated Granite's federal tariffs by failing to pay the tariffed rates for the services it used.

**ANSWER NO. 46:**    Denied.

47.    Granite has been damaged in an amount to be determined at trial.

**ANSWER NO. 47:**    Denied.

WHEREFORE, Granite pray for relief as hereinafter set forth.

## COUNT II
### (BREACH OF STATE TARIFFS)

48.    Granite incorporates by reference as though fully set forth herein the allegations of preceding paragraphs of this Complaint.

**ANSWER NO. 48:**    AT&T hereby incorporates by reference, as though fully set forth herein, the previous responses to the allegations in the preceding paragraphs of this Complaint.

49.    For the reasons set forth above and in the FCC Access Charge Order and FCC AT&T Calling Card Access Charges Order, AT&T is liable to Granite for its failure to pay intrastate access charges on intrastate interexchange traffic that AT&T delivered to Granite for termination.

**ANSWER NO. 49:**    Denied.

50.    Granite's intrastate access charges for long distance calls except in Montana, Nevada, North Carolina, and Oregon are set forth for the respective state in the following tariffs: Alabama P.S.C. Tariff No. 3, A.C.C. Tariff No. 2 (Arizona), Arkansas P.S.C. Tariff No. 3, Schedule Cal.  P.U.C. No. l-T (California), Colorado P.U.C. Tariff No. 2, Connecticut D.P.U.C. Tariff No. 2, Delaware P.S.C. Tariff No. 2, District of Columbia P.S.C. Tariff No. 2, Florida P.S.C. Price List No. 2, Georgia P.S.C. Tariff No. 3, Hawaii PUC Tariff No. 2, Idaho PUC Price List No. 2, Ill. C.C. No. 2 (Illinois), Indiana Tariff No. 2, IUB Tariff No. 2 (Iowa), Kansas, Access Services Tariff, Kentucky Tariff No. 2, Louisiana P.S.C. Tariff No. 2, Maine P.U.C. Tariff No. 2, PSC MD Tariff No. 2 (Maryland), Massachusetts D.T.E. Tariff No. 2, Michigan Tariff M.P.S.C. No. 2, Minnesota P.U.C. Tariff No. 3. Mississippi P.S.C. Tariff No. 2, Missouri P.S.C. Tariff No. 2, Nebraska P.S.C. Tariff No. 3, Nevada P.U.C. 1, New Hampshire P.U.C. Tariff No. 2, New Jersey B.P.U. No.  2 - Telephone, New  Mexico P.R.C. Tariff No. 2, New York P.S.C. Tariff No. 3 – Telephone, NDPSC Tariff No. 2 (North Dakota), P.U.C.O. Tariff No. I (Ohio), Oklahoma Tariff No. 3, Tariff Telephone-Pa. P.U.C. No. 3 (Pennsylvania), Rhode Island P.U.C. Tariff No. 2, South Carolina P.S.C. Tariff No. 3, South Dakota P.S.C. Tariff No. 3, Tennessee R.A. Tariff No. 2, Texas P.U.C. Tariff No. 3, Utah Price List No. 2, VPSB Tariff No. 2 (Vermont), VA S.C.C. Tariff No. 3 (Virginia), Washington (State) Price List No. 2, P.S.C. W. Va. Tariff No. 2 (West Virginia), WI PSC Tariff No. 1, Amendment No. 1 (Wisconsin), and Wyoming P.S.C. Tariff No. 3.

**ANSWER NO. 50:**    AT&T admits that tariffs contain the rates and other terms on which Granite offers certain of its access services.  AT&T denies the remaining allegations in paragraph 50.

51.    Each of the tariffs listed above provide, among other things, that AT&T must pay Granite intrastate access charges for both originating access and terminating access.

**ANSWER NO. 51:**    AT&T avers that paragraph 51 states a legal conclusion, and that conclusions of law are for the Court.  Further, the tariffs speak for themselves and no response is required.  Any remaining allegations in paragraph 51 are denied.

52.    Granite fully performed its obligations under each of the tariffs listed above, except for those it was prevented from performing, those that it was excused from performing, or those that were waived by AT&T's misconduct as alleged herein.

**ANSWER NO. 52:**    Denied.

15

53.     AT&T materially violated the tariffs listed above by failing to pay the tariffed rates for the services it used.

**ANSWER NO. 53:**   Denied.

54.     Granite has been damaged in an amount to be determined at trial.

**ANSWER NO. 54:**   Denied.

WHEREFORE, Granite pray for relief as hereinafter set forth.

## COUNT III (In the Alternative)
(BREACH OF CONTRACT)

55.     Granite incorporates by reference as though fully set forth herein the allegations of preceding paragraphs of this Complaint.

**ANSWER NO. 55:**   AT&T hereby incorporates by reference, as though fully set forth herein, the previous responses to the allegations in the preceding paragraphs of this Complaint.

56.     AT&T is obligated to pay Granite for interstate and intrastate switched access services in accordance with the Contract.

**ANSWER NO. 56:**   AT&T avers that paragraph 56 states a legal conclusion, and that conclusions of law are for the Court.  Further, the contract speaks for itself and no response is required.  Any remaining allegations in paragraph 56 are denied.

57.     Granite fully performed its obligations under the Contract, except for those it was prevented from performing, those it was excused from performing, or those that were waived by AT&T's misconduct as alleged herein.

**ANSWER NO. 57:**   Denied.

58.     AT&T failed to pay Granite for interstate and intrastate switched access services in accordance with the Contract.

**ANSWER NO. 58:**   Denied.

59.     AT&T materially breached the Contract by failing to pay for the switched access services it used.

**ANSWER NO. 59:**   Denied.

60.     Except with respect to intrastate access charges in Montana, Nevada, North Carolina and Oregon, where Granite does not have intrastate access tariffs and therefore relies

16

solely on the Contract, this Count is pleaded in the alternative, to the extent that Granite's Tariffs are determined not to apply. In no way is this Count to be construed as an admission that the tariffs do not govern AT&T's obligations in this case.

**ANSWER NO. 60:** AT&T admits that the Complaint purports to plead, in part, a claim in the alternative, but denies that such pleading is appropriate.

61. Granite has been damaged in an amount to be determined at trial.

**ANSWER NO. 61:** Denied.

WHEREFORE, Granite pray for relief as hereinafter set forth.

### COUNT IV (In the Alternative)
(UNJUST ENRICHMENT)

62. Granite incorporates by reference as though fully set forth herein the allegations of preceding paragraphs of this Complaint.

**ANSWER NO. 62:** AT&T hereby incorporates by reference, as though fully set forth herein, the previous responses to the allegations in the preceding paragraphs of this Complaint.

63. For the reasons set forth above and in the FCC Access Charge Order and FCC . AT&T Calling Card Access Charges Order, pursuant to the Contract and/or Granite's federal and state tariffs. AT&T is liable to Granite for its failure to pay interstate and intrastate access charges on interexchange traffic that AT&T delivered to Granite for termination. This Count IV is pleaded solely in the alternative, in the unlikely event the Contract and tariffs are determined not to apply to every instance of AT&T's alleged conduct. In no way is this Count IV to be construed as an admission that the Contract and tariffs do not govern this case.

**ANSWER NO. 63:** AT&T admits that the Complaint purports to plead a claim in the alternative, but it denies that such pleading is appropriate. The remaining allegations in paragraph 63 are denied.

64. By terminating interexchange calls carried by AT&T to Granite's local telephone customers, Granite permitted AT&T's subscribers to complete long-distance calls to Granite's customers. Granite thereby conferred a benefit on AT&T.

**ANSWER NO. 64:** Denied.

65. AT&T understood that the termination of interexchange calls by Granite was important to AT&T's long-distance customers, and it accordingly appreciated and recognized that Granite's termination of interexchange calls carried by AT&T was a benefit to AT&T.

**ANSWER NO. 65:**   Denied.

66.    AT&T unjustly accepted and retained the benefit of Granite's call termination services without providing legally required compensation to Granite.

**ANSWER NO. 66:**   Denied.

67.    Granite has been damaged in an amount to be determined at trial.

**ANSWER NO. 67:**   Denied.

WHEREFORE, Granite pray for relief as hereinafter set forth.

### COUNT V
### (FRAUD)

68.    Granite incorporates by reference as though fully set forth herein the allegations of preceding paragraphs of this Complaint.

**ANSWER NO. 68:**   AT&T hereby incorporates by reference, as though fully set forth

herein, the previous responses to the allegations in the preceding paragraphs of this Complaint.

69.    AT&T committed fraud against Granite.  Specifically, AT&T knowingly, and with the intent to defraud, made or caused to be made misrepresentations and omissions of material facts, including, but not limited to the following:

     (a)    AT&T made public statements that sought to falsely minimize the volume of interexchange traffic that it was delivering to Granite for termination without payment of the appropriate access charges;

     (b)    AT&T disguised long-distance calls placed by AT&T customers to Granite's local customers by concealing, changing, causing to be concealed or changed, or otherwise misrepresenting the originating telephone number transmitted with the call, and by misrepresenting other information provided to Granite, all of which were essential to Granite's ability to properly identify calls as interstate and intrastate interexchange calls;

     (c)    AT&T provided Granite with false and incorrect information as to the relative percentages of interstate long-distance, intrastate long-distance, and local calls that AT&T delivered to other carriers to be delivered to Granite; and

     (d)    AT&T failed to put Granite on notice with specificity of its practice of avoiding access charges for interexchange traffic, or of the extent to which AT&T adopted and employed this practice.

**ANSWER NO. 69:**   Denied.

70.     These misrepresentations and omissions were false and misleading at the time they were made.

**ANSWER NO. 70:**    Denied.

71.     AT&T made each of these misrepresentations and/or omissions with knowledge of their falsity or recklessly without regard for their truthfulness as a positive assertion, with the intent to deceive Granite, and with the intent to induce Granite to act in the manner herein alleged.

**ANSWER NO. 71:**    Denied.

72.     Indeed, on a daily basis through the time period relevant to this Complaint, AT&T represented to its customers (but not to Granite), in bills and otherwise, that the interexchange calls that it delivered to Granite were in fact long-distance calls because it billed them long distance rates.

**ANSWER NO. 72:**    Denied.

73.     Moreover, AT&T paid at least hundreds of millions of dollars in originating access charges on the same calls that it disguised as local calls so as to mislead Granite and other LEC's into believing that no terminating access charges were due.  Any claim by AT&T that it did not know that terminating access charges were due on these calls is contradicted by the fact that it paid the originating access charges on at least many of the same calls without disputing the bills it received for originating access charges.  AT&T knew that these calls were long distance calls that were subject to access charges.  It paid the originating access charges because in most cases it had no way to conceal the nature of these calls from the LECs providing originating access.  But because it conceived of a scheme to deceive these same LECs, when they provided terminating access, into believing that these calls were local calls  it knowingly used this deceitful scheme in an effort to cheat Granite and other LECs out of hundreds of millions of dollars in terminating access charges.

**ANSWER NO. 73:**    Denied.

74.     Granite was, in fact, deceived by AT&T's misrepresentations and omissions.

**ANSWER NO. 74:**    Denied.

75.     Granite reasonably and justifiably relied to its detriment on AT&T's misrepresentations and omissions.  Granite had no reason to believe that AT&T was engaging in trickery to avoid paying terminating access charges on such calls.  Due to AT&T's fraudulent conduct, Granite was unable to bill for (or even to detect or measure) the interexchange traffic that AT&T terminated on Granite's local networks, nor was Granite able to ascertain the volume of interexchange traffic that AT&T was delivering for termination without payment of access charges.  The truth about the scope of AT&T's unlawful conduct accordingly remained within the peculiar knowledge of AT&T, which engaged in deceptive acts calculated to mislead and thereby obtain an unfair advantage.

**ANSWER NO. 75:**    Denied.

76.    Granite was damaged as a direct and proximate result of AT&T's misrepresentations and omissions in an amount to be determined at trial.  Such damages include, but are not limited to, the following:

(a)    The access charges that AT&T avoided paying;

(b)    The additional costs to Granite since discovery of AT&T's scheme of using complex and costly methods to determine and prove the amount of access charges that AT&T avoided through its fraudulent scheme; and

(c)    The opportunity cost of the delay in receiving funds during a time period when capital was extraordinarily difficult for CLECs such as Granite to raise.

**ANSWER NO. 76:**    Denied.

## ANSWER TO PRAYER FOR RELIEF

AT&T denies that Granite is entitled to any of the relief it seeks.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Granite's Complaint is barred because it fails to state claims upon which relief can be granted.

### Second Affirmative Defense

Granite's Complaint is barred by the doctrine of accord and satisfaction.

### Third Affirmative Defense

Granite's Complaint is barred to the extent that the claims are outside the applicable statutes of limitations.

### Fourth Affirmative Defense

Granite's Complaint is barred by the doctrines of waiver and estoppel.

### Fifth Affirmative Defense

Granite's Complaint is barred by the doctrine of laches and unclean hands.

### Sixth Affirmative Defense

Granite's state law contract and unjust enrichment claims are preempted by federal law and/or are foreclosed by state statutory law.

### Seventh Affirmative Defense

Granite's Complaint is barred because it is foreclosed and preempted by the federal statutory requirement that charges for the transport and termination of telecommunications be cost-based.

### Eighth Affirmative Defense

Granite's Complaint is barred because Granite's attempt to collect access charges for past periods constitutes an unjust, unreasonable, and discriminatory charge and practice in violation of the Communications Act and state law.

### Ninth Affirmative Defense

Granite's request for retroactive damages is barred because such retroactive recovery would be inequitable and unlawful.

### COUNTERCLAIMS OF AT&T

AT&T for its Counterclaims against Granite, states as follows:

### JURISDICTION AND VENUE

1.      These Counterclaims are filed in part to collect damages caused by illegal acts of Granite, a common carrier subject to the Communications Act of 1934, as amended by the

Telecommunications Act of 1996.  These Counterclaims therefore arise under Section 206 of the Communications Act of 1934, 47 U.S.C. § 206, and this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, and 47 U.S.C. § 207.  In addition, this Court has jurisdiction over AT&T's state-law Counterclaims pursuant to 28 U.S.C. § 1367.

2.      Personal jurisdiction is appropriate in this district because Granite routinely transacts business in this district.

3.      To the extent that the Court finds that venue is proper in this district regarding the claims in Granite's complaint, then venue is proper in this judicial district under 28 U.S.C. § 1391(b) because Granite has agents that transact business in the district.

## PARTIES

4.      Defendant/Counterclaim Plaintiff AT&T Corp. ("AT&T") is a New York corporation with its principal place of business in Bedminster, New Jersey.  AT&T provides, among other things, telecommunications services throughout the United States, including in the District of Columbia.

5.      The Plaintiff/Counterclaim Defendant is Granite Telecommunications, LLC ("Granite").  Granite is a limited liability company organized under the laws of the state of Delaware, with its principal place of business at 234 Copeland Street, Quincy, Massachusetts 02169.

## BACKGROUND

6.      Granite seeks, through this proceeding, to collect millions of dollars in access charges with respect to phone-to-phone IP telephony service and enhanced prepaid service calls that AT&T delivered to Granite during the past several years.  AT&T delivered phone-to-phone IP telephony service and enhanced prepaid service calls to Granite for completion to the called

parties.  AT&T paid all applicable charges for Granite's completion of those calls.  With respect to the phone-to-phone IP telephony service and certain of the enhanced prepaid service calls at issue, Granite now contends that AT&T should have paid higher access charges set forth in the Granite contract or Granite's federal and state access tariffs.  With respect to certain other enhanced prepaid service calls at issue, Granite alleges that AT&T should have paid the higher intrastate access charge rates, and not the lower interstate access charge rates, set forth in the Granite contract or Granite's federal and state access tariffs.  In particular, Granite alleges that it is entitled to collect additional access charges under the Granite contract and, in the alternative, various state and federal access tariffs.

7.    AT&T denies that it has any liability to Granite under the Granite contract or Granite's federal and state access tariffs in connection with the phone-to-phone IP telephony service and enhanced prepaid service calls that Granite terminated.  In the event it is determined that AT&T has liability for access charges under the Granite contract or Granite's federal and state access tariffs, however, AT&T counterclaims that any contract or federal and state access tariff provisions determined to require AT&T to pay access charges on the past period phone-to-phone IP telephony service and enhanced prepaid service calls that are the subject of this lawsuit are unjust, unreasonable and discriminatory in violation of the federal Communications Act and state law.  Among other things, it would be unjust, unreasonable and discriminatory for Granite to collect additional access charges under its contract or tariffs when Granite has not issued any bills for such charges to AT&T (as required by the Granite contract or its own access tariffs as a condition precedent to payment obligations), AT&T has not refused to pay such bills, Granite had offered AT&T other services and has accepted, without protest, AT&T's payments for those different services, AT&T has relied upon these arrangements to make substantial investments in

infrastructure, AT&T has complied in all material respects with the terms of the tariffs and contracts under which it exchanged this traffic with Granite, and Granite has not (until years after the fact) sought retroactive payment of access charges under its federal and state access tariffs.

8.    Granite is a common carrier, public utility and public service corporation within the meaning of the Communications Act and state law, respectively, and it acts in these capacities to the extent it provides access services to AT&T.

9.    Sections 201 and 202 of the Communications Act and analogous state statutes deem illegal all "unjust" "unreasonable" and "discriminatory" charges and practices by common carrier. *See, e.g.*, 47 U.S.C. §§ 201, 202. Retroactive imposition and collection of access charges under the circumstances presented here would be unjust, unreasonable and discriminatory in violation of these laws, and the Granite contract and Granite's access charge tariff provisions are unjust, unreasonable and discriminatory to the extent that they are deemed to apply to the phone-to-phone IP telephony service and enhanced prepaid service calls at issue in this case.

## COUNT I
### (Violating 47 U.S.C. §§ 201 and 202 by Retroactive Imposition of Access Charges)

10.    AT&T incorporates the preceding paragraphs of the Counterclaims as if set forth here.

11.    Under federal law, unjust, unreasonable and discriminatory tariff provisions are unlawful. Moreover, it is unlawful for a common carrier to impose unjust, unreasonable or discriminatory charges or to engage in unjust, unreasonable or discriminatory practices, including unjust or unreasonable applications of its tariffs. 47 U.S.C. §§ 201, 202. To the extent that they are deemed to require payment of access charges on the past period phone-to-phone IP telephony service and enhanced prepaid service calls at issue in this case, the contract

and federal access tariff provisions that Granite asserts here are unjust, unreasonable and discriminatory and impose unjust, unreasonable and discriminatory charges in violation of the Communications Act.  Retroactive imposition of access charges under the Granite contract and Granite's federal access tariffs under the circumstances presented here would be unjust, unreasonable and discriminatory in violation of the Communications Act, and would cause substantial damage to AT&T.

### **COUNT II**
**(Violating State Law Prohibitions Against Unjust, Unreasonable And Nondiscriminatory Tariffs, Charges And Practices by Retroactive Imposition of Access Charges)**

12.    AT&T incorporates the preceding paragraphs of the Counterclaims as if set forth here.

13.    Under state law, unjust, unreasonable and discriminatory contracts and tariff provisions are unlawful.  Moreover, it is unlawful for a common carrier to impose unjust, unreasonable and discriminatory charges or to engage in unjust, unreasonable or discriminatory practices.  To the extent that they are deemed to require payment of access charges on the past period phone-to-phone IP telephony service and enhanced prepaid service calls at issue in this case, the Granite contract and Granite's state access tariffs are unjust, unreasonable and discriminatory and impose unjust, unreasonable and discriminatory charges in violation of these state laws.  Retroactive imposition of access charges under the Granite contract and Granite's state access tariffs under the circumstances presented here would be unjust, unreasonable and discriminatory in violation of these state laws, and would cause substantial damage to AT&T.

## **PRAYER FOR RELIEF**

WHEREFORE, Defendant/Counterclaim Plaintiff AT&T respectfully requests that the Court enter judgment in its favor against Granite and that it grant AT&T the following relief:

       (a)     Money damages to be proven at trial, plus prejudgment interest;

       (b)     Restitution;

       (c)     All costs and attorney's fees incurred by AT&T;

       (d)     Preliminary and permanent injunctive relief enjoining Plaintiff/Counterclaim Defendant from continuing to engage in the unlawful conduct complained of; and

       (e)     Such other relief as the Court deems appropriate.

AT&T hereby demands a jury trial on all issues and claims so triable.

August 22, 2005

Respectfully submitted,

/s/ Michael J. Hunseder

_____
David M. Schiffman
Sidley Austin Brown & Wood, LLP
Bank One Plaza
10 South Dearborn
Chicago, Illinois 60603
Phone:  (312) 853-7782
Fax:      (312) 853-7036

Paul M. Zidlicky (DC Bar No. #450196)
Michael J. Hunseder (DC Bar No. #447260)
Sidley Austin Brown & Wood, LLP
1501 K Street, N.W.
Washington, DC  20005
Phone:  (202) 736-8000
Fax:      (202) 736-8711

***Attorneys for Defendants AT&T Corp. and AT&T Communications, Inc.***

DC1 790388v.1